**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

MICHAEL JOHN THORPE                                          PLAINTIFF

V.                              CASE NO. 5:18-CV-5052

BLAKE WEBB, in his individual
and official capacities                                      DEFENDANT

<u>MEMORANDUM OPINION</u>

On March 22, 2015, the extended Thorpe family gathered at Sean and Shannon Thorpe's home in Highfill, Arkansas to celebrate the occasion of their daughter's first birthday.[1] (Doc 38. p. 16-17). A large number of family members attended the party, including Michael Thorpe—who is Sean's father and the Plaintiff here ("Mr. Thorpe"); Sean's mother; and Sean's siblings and their children. Shannon's family also attended the party that afternoon, including her father, Henry "Jody" Stidham. As the party progressed, Sean and Jody began drinking, which led to some untoward things being said, and then a fight broke out. Shannon called the police to request assistance. Highfill Police Chief Blake Webb ("Chief Webb") arrived shortly thereafter and pushed his way inside the home to investigate, despite Mr. Thorpe's vehement objections and protest . In the end, Jody Stidham was sent to the hospital with injuries from his fight with Sean, and Chief Webb arrested Mr. Thorpe for obstructing governmental operations (although formal charges were not pursued). Mr. Thorpe now brings this action under 42 U.S.C. § 1983, alleging that Chief Webb violated his Fourth Amendment rights by unlawfully entering *Sean's* house and for illegal arrest.

---

[1] Sean and Shannon were married after the occurrence of these events.

1

## I. The Events on March 22, 2015

The following facts are taken from the dispatch log, a dashcam video, deposition testimony, and other uncontroverted evidence, and they are presented in the light most favorable to Mr. Thorpe. On March 22, 2015 Shannon called 911 to report that her father (Jody) and Sean were fighting. The 911 dispatch log (Doc. 23-4) indicates the following:

4:11 p.m.

- Shannon reported that Jody hit Sean and that they had "destroyed [the] house." She also reported that Jody would not leave the house.

- Shannon stated that she wanted her dad to leave the house and that she wanted to press charges.

- Shannon also reported that there were weapons in the house and that Jody had been drinking.

- Shannon explained that all three men—Jody, Sean, and Mr. Thorpe—were fighting.

4:13 p.m.

- Shannon reported that fighting was still ongoing and that someone was bleeding from the mouth and had injuries to their hands and back.

- She also reported that the children were outside, away from the fighting.

4:14 p.m.

- Shannon reported that her father had fled to a gas station across the street.

4:16 p.m.

- Shannon stated that she did not think Sean needed medical treatment.

- Medical personnel were told to proceed since the antagonists were separated.

- Shannon informed dispatch that the fight occurred because Sean became angry with her and started calling her names.

4:23 p.m.

- Chief Webb arrives on scene.

4:24 p.m.

- Dispatch was informed that one of the participants in the fight had "bruising all over body" and was "beat up pretty good."

4:26 p.m.

- Mr. Thorpe separately called 911 and stated that an officer was threatening his rights.

Chief Webb was the first police officer to arrive on scene.[3] He exited his patrol car and encountered approximately 15 to 20 people in the front yard, none of whom indicated they were in any danger. Chief Webb described the scene as "very chaotic." (Doc. 23-1, p. 7). In his deposition, Mr. Thorpe testified that he greeted Chief Webb in the yard and explained that Jody had left, and that Sean was still in the house. Mr. Thorpe then offered to go get Sean and bring him outside. (Doc. 23-2, at 10-12). As Mr. Thorpe and Chief Webb approached the house,[4] Chief Webb tried to accompany Mr. Thorpe through the doorway. *Id.* But Mr. Thorpe told Chief Webb, "No, you can't come in here." Chief

---

[3] Chief Webb was "aware of all of the information logged in the entries [of the dispatch log] from 16:12:10 through 16:23:43 when [he] arrived on scene of the accident." (Doc. 32, p. 8).

[4] The undisputed evidence shows that an entity owned by Mr. Thorpe and his wife—MST Properties, LLC.—owned the property in question, which they provided to Sean and Shannon to reside rent-free. Mr. Thorpe did not reside at the Highfill house, but rather in a different house several miles asway in Bentonville. (Doc. 38, pp. 9, 16).

Webb pushed past Mr. Thorpe and entered the home. Chief Webb walked back to Sean's bedroom and said, "Sean, let's go outside." *Id.*

Shortly afterwards, Officers Jason List and Kienan Williams from the Gentry Police Department arrived (Doc. 23-4, p. 3), and a dashcam on Officer Williams's patrol car captured the events that followed. (Doc. 23-6).

4:28 p.m.[6]

- The video shows one patrol car following another patrol car and then arriving at Sean and Shannon's home. (*Id.* at time stamp 7:13). The first patrol car abruptly stops, forcing the second car—the one with the dashcam—to remain in the highway. The video does not show why the first car stopped abruptly. While the patrol cars are stopped, someone off-screen says, "Ok we're trying to help him, we're trying to figure out what happened, alright? Are you OK with that? We're here to help. That is the last time I'm telling you. If you say one more word, you will be detained for no reason other than [garbled]." (*Id.* at time stamp 7:50)

4:29 p.m.

- The patrol cars pull forward into the yard. Three police officers are speaking to Sean. (*Id.* at time stamp 8:38). The officers disperse, but one remains by Sean. This officer asks Sean, "Do you have any weapons on you besides your pocketknife?" Sean appears to answer in the negative. The officer

---

[6] The stated times in this section are approximate. The 911 dispatch log indicates that the two Gentry police officers arrived at 4:28pm. (Doc. 23-4, p. 3), which correlates to the time stamp at 7:13 on Officer Williams's dash-cam video. (Doc. 23-6). Thus, the formula used to estimate the stated time of day is 4:21 p.m. + x, where x = the time stamp on Williams's dash-cam video.

then says, "I'm going to pat you down real quick." Sean replies, "For what?" The officer responds, "To make sure you don't have any other weapons." Sean states, "I told you, all I got is my knife." The officer says, "Ok, well I'm going to pat you down. If you have a problem with that then there's going to be issues."

- While the officer is making this statement, someone off-screen interjects, and the officer momentarily turns towards that speaker.

- Sean then says, "I'm not giving you . . . no . . . there's no reason to pat me down." (*Id.* at time stamp 9:22).

4:30 p.m.

- Mr. Thorpe (off-screen) says, "Is he under arrest?"

- Sean says, "I'm standing . . . I'm being civil, I'm not doing anything." The officer, gesturing to a nearby car, says, "Put your hands on the car."

- Off-screen, Mr. Thorpe again objects to his son being patted down. Chief Webb, who had been walking away from Mr. Thorpe, spins around and says to Mr. Thorpe: "You're under arrest for obstruction." (*Id.* at time stamp 9:36).

- The police officer on-screen says to Sean, "I'm going to put you in handcuffs if you don't put the cigarette down. Do you understand?" (*Id.* at time stamp 9:39). Sean begins walking towards the nearby car, and the police officer says, "Just let me pat you down." (*Id.* at time stamp 9:48). Sean puts his hands on the nearby car, and the officer begins patting him down. The

officer says, "No hard feelings man, I'm just making sure you don't have a gun."  (*Id.* at time stamp  9:59).

4:31 p.m.

- Sean says to his father "I told you to keep your mouth shut, Dad."  (*Id.* at time stamp  10:16).  Sean's mother (off-screen) says "Sean, please be quiet."  Sean responds, "They told him a hundred fucking times to keep his mouth shut."  Mrs. Thorpe says, "I know. It's okay."  Sean continued venting: "And he just had to keep on [garbled]."

- Chief Webb escorts Mr. Thorpe in handcuffs across the yard. (*Id.* at time stamp 10:24).

- Sean says to his mother, "Honestly, he fucking deserved it.  He couldn't keep his . . . mouth shut. (*Id.* at time stamp 10:40).

Mr. Thorpe's recollection of events tracks with the dashcam video.  According to Mr. Thorpe, as he was walking out of Sean's house, he told advised Sean "to be clear in his thoughts and careful what he said." (Doc. 23-2, p. 14).  In response, Chief Webb told Mr. Thorpe, "If you say one more word, I'll arrest you."  *Id.*  Mr. Thorpe then admits that he tried to stop the Gentry Police Department officers from entering the property, and he admits he asked them what they were doing on his property.  *Id.* at p. 14–16.  He asserts that he stepped out of the way of the patrol cars once they told him who they were and why they were there.  Mr. Thorpe states that he then moved away and stood behind his daughter's car.  He then asked, "Is my son under arrest?" *Id.* at p. 14.  At this point, Chief Webb placed Mr. Thorpe under arrest.  Mr. Thorpe also states that, at some point, he asked whether Sean needed a lawyer.

Police reports filed by Officer List and Officer Williams corroborate the dashcam video. Officer List states that when he pulled into the driveway of the house, Mr. Thorpe approached the patrol car with his hands up. (Doc. 23-5, p. 5). Officer List also states that Mr. Thorpe was very uncooperative and would not follow Chief Webb's directions to remain quiet. *Id.* Officer List's report states that Chief Webb warned Mr. Thorpe to "stop interfering or he would go to jail." *Id.* Mr. Thorpe continued to raise his voice and ignored the commands of Chief Webb to stop talking. *Id.* At that point, Chief Webb arrested Mr. Thorpe. *Id.*

## II. LEGAL STANDARD

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.  DISCUSSION

Pursuant to 42 U.S.C. § 1983, Mr. Thorpe asserts two Fourth Amendment claims against Chief Webb in his individual and official capacities for unlawful entry and unlawful arrest.  Chief Webb argues that his entry into the house and his arrest of Mr. Thorpe were objectively reasonable, and he that he is entitled to qualified immunity on the claims against him in his individual capacity.  Chief Webb also argues that the claims against him in his official capacity should be dismissed because Mr. Thorpe has failed to identify a policy or custom that led to the alleged constitutional violations.

After considering the summary judgment briefings and the evidence of record, the Court sought additional briefing from the parties on the issue of whether Mr. Thorpe has standing to assert that his Fourth Amendment rights were violated when Chief Webb

entered the house.  The Court will first take up this standing issue and then turn to the question of qualified immunity, before finally considering official capacity liability.

## A. Fourth Amendment Standing

Based on the undisputed evidence, the Court finds as a matter of law that Mr. Thorpe did not possess any reasonable expectation of privacy in Sean's home, and thus no fact questions remain for a jury to decide.  The Court therefore grants summary judgment to Chief Webb on the illegal entry claim.

 "Fourth Amendment rights are personal rights that may not be asserted vicariously."  *United States v. Barragan*, 379 F.3d 529 (8th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)).  "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'"  *Id.* at 529 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  The following factors are relevant to Fourth Amendment standing:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).  Other courts have held that a landlord does not have a reasonable expectation of privacy with respect to property that he or she has leased to a tenant and is occupied by that tenant.  *Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1006–07 (D. Minn. 2008) (citing *Rozman v. City of Columbia Heights*, 268 F.3d 588, 591 (8th Cir. 2001)) (holding that landlords did not have standing to challenge searches of their tenants' apartments), *aff'd in part, rev'd in part on other grounds sub*

*nom Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010); *see Miller v. Hassinger*, 173 F. App'x 948, 952 (3d Cir. 2006) (holding landlord did not have standing to challenge the search of an apartment where he did not have access to the apartment, did not stay there, and did not keep personal items there).  On the other hand, some courts have found that landlords do have standing to contest illegal entries if the landlord can demonstrate that a tenant is a "mere guest."  *Beatty v. Township of Elk*, 2010 WL 1493107, at *9 (D. N.J. Apr. 14, 2010) (holding that, since the evidence indicated that the landlord "maintained a contemporaneous right of possession," the landlord had standing to contest a search).

Mr. Thorpe argues, without citation to authority, that he has standing to contest Chief Webb's entry into Sean's house because he allowed Sean to live there rent-free and because he had the "right to include or exclude anyone from being in the house." (Doc. 44, p. 2).  Chief Webb's argument to the contrary is that Mr. Thorpe "did not use [the house] as his home" while Sean and Shannon lived there, and thus Mr. Thorpe did not have a legitimate expectation of privacy in the house.  (Doc. 43, p. 2–3).

The Court agrees with Chief Webb.  Viewing the evidence in the light most favorable to Mr. Thorpe, the Court finds that no reasonable juror could conclude that Mr. Thorpe had a reasonable expectation of privacy in the house.  It is undisputed that the house is owned by an entity, MSD Properties,[7] which in turn is owned by Mr. Thorpe and his wife.  (Doc. 38, p. 78).  But it is also undisputed that Sean lived in that house with his

---

[7] The Arkansas Secretary of State's website indicates that this entity is actually known as MST Properties L.L.C.  Arkansas Secretary of State, *Business Entity Search*, https://www.sos.arkansas.gov/corps/search_corps.php?DETAIL=391291&corp_type_id =&corp_name=mst+properties&agent_search=&agent_city=&agent_state=&filing_numb er=&cmd= (last visited March 31, 2020).

family.  As Mr. Thorpe explained during his deposition, "[Sean] lives in one of my houses." *Id.* at p. 16.  Mr. Thorpe also testified that Shannon and Sean's infant daughter lived in the house.  *Id.* at p. 17.  As for the other three buildings on the same tract of property, Mr. Thorpe testified that each of those buildings is occupied by a paying tenant.  *Id.* at p. 17. As for Mr. Thorpe, he did not reside with Sean in Highfill; instead, he lived in his own home in Bentonville.  *Id.* at p. 9.  The  undisputed evidence is that Mr. Thorpe was acting as a lessor towards the entire tract of property in Highfill, including Sean's and Shannon's home.

It is undisputed that Sean and his family had possession of the home.  Whether Sean paid rent is a non sequitur, as the relevant test focuses upon the parties' possession of the house and their expectations of privacy in the house.  As for Mr. Thorpe, the undisputed evidence only establishes that his company held legal title to the house, which is insufficient to provide Fourth Amendment standing.  There is no evidence that Mr. Thorpe kept keys to the house, kept personal property in the house, or otherwise had a contemporaneous right of possession to the house.  Accordingly, the Court finds as a matter of law that Mr. Thorpe did not hold a privacy interest in the house that could have been violated by Chief Webb's warrantless entry.  Thus, Mr. Thorpe may not assert a claim for illegal entry under the Fourth Amendment.

### B.  Qualified Immunity

The Court next turns to the issue of qualified immunity.  Chief Webb asserts that he is entitled to qualified immunity from the claims brought against him in his individual capacity.  "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the

challenged conduct.'" *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)) (internal quotation marks omitted). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' . . . meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)). "To be clearly established, preexisting law must make the unlawfulness of the officials' conduct apparent so that they have 'fair and clear warning' they are violating the constitution; qualified immunity therefore protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). Accordingly, "qualified immunity protects officials who make bad guesses in gray areas" and "gives them breathing room to make reasonable but mistaken judgments." *Id.* (citing *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004); *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014)). Thus, even if Mr. Thorpe has Fourth Amendment standing to challenge Chief Webb's entry into the house, qualified immunity may bar that claim.

The correct inquiry when dealing with qualified immunity at the summary judgment stage "is whether, even if [the court] construe[s] the facts in a light most favorable to the plaintiff[], a reasonable official in [Chief Webb's] position would have known that he was violating the constitution when" he entered Sean's house and arrested Mr. Thorpe. *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013). The Court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## 1. Illegal Entry

For the reasons explained above, the Court has already disposed of this claim. However, even if Mr. Thorpe had a reasonable expectation of privacy in Sean's house, the Court would nevertheless grant Chief Webb summary judgment as to his assertion of qualified immunity.

It is certainly true that a warrantless search of an individual's home is presumptively unreasonable, subject to only a few exceptions, *see United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011), and there is no factual dispute that Chief Webb entered Sean's house without a warrant. Still, warrantless entries are acceptable if they are "objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotations and citations omitted). Chief Webb argues that he is entitled to qualified immunity on this claim because his entry into the house was excused by the "emergency aid" and "community caretaking" exceptions to the warrant requirement. For the reasons discussed below, the Court finds the emergency aid exception applicable here, but disagrees with Chief Webb's assertion of the community caretaking exception.

### The "Emergency Aid" Exception to the Warrant Requirement

"[T]he need to assist persons who are seriously injured or threatened with such injury" is an exigency that excuses a warrantless entry. *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (citing *Brigham City*, 547 U.S. at 403). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are

investigating when the emergency arises." *Id.* (citing *Brigham*, 547 U.S. at 404–05).[9] Instead, this exception to the warrant requirement only requires "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Id.* (internal citations and quotations omitted).

Here, a reasonable officer in Chief Webb's shoes would have known that Shannon had called 911 and that a fight had occurred. A reasonable officer would also have known that at least two individuals—Sean and Jody—were involved in the fight and that someone was "bleeding from [the] mouth" and had injuries to their hands and back (Doc. 23-4, p. 6). It would have been unclear to a reasonable officer if both Sean and Jody had incurred those injuries or if only one of them had been injured. A reasonable officer would have been aware that Shannon told 911 that firearms were present in the house and that the house had been "destroyed." (Doc. 23-4, p. 5). A reasonable officer would also have known at least one of the participants in the fight had left the house, and a reasonable officer could also have believed that Sean was in the house in need of immediate aid, since Shannon and Mr. Thorpe both told Chief Webb that Sean was in the house. Nothing about the situation at the house would have dispelled an officer's reasonable belief that a victim needed immediate aid: the scene was "chaotic," included approximately 15-20 individuals, and there was no evidence that all participants from the fight had either left the home or were otherwise unharmed.

---

[9] Mr. Thorpe argues that *Michigan* and *Brigham City* are factually distinguishable from the present case. While the Court agrees that those Supreme Court precedents are factually distinct from this case, the Eighth Circuit has applied those precedents in a manner that is relevant to the present case. Those Eighth Circuit cases are discussed below.

The Eighth Circuit addressed similar situations in *Smith v. Kansas City, Missouri Police Department*, 586 F.3d 576 (8th Cir. 2009) and *Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012). In *Smith*, officers responded to an emergency call from a woman who told them that she had been assaulted by Terry Smith. 586 F.3d at 579. She appeared to have been in a physical altercation, and she told the officers that Terry was either at the house of his brother, Wilson, or at the house of another relative. *Id.* The officers went to Wilson's house; one of the officers went to the back of the house and informed the other officers that there was a "hostile situation." *Id.* The officers then knocked on the front door, which Wilson answered. *Id.* The officers then pulled Wilson out of the house, leaving the door open. *Id.* One of the officers saw a 12-year old child in the home through the open door, and then entered the house where they found Terry in a bedroom. *Id.* The officers attempted to justify this warrantless entry on the grounds that a domestic violence suspect was in the home with a child. *Id.* at 580. The Eighth Circuit disagreed, noting that there was no indication that the suspect was a threat to the child or others and that there was no indication that weapons were present. *Id.*

The Eighth Circuit reached the opposite conclusion in *Burke*. There, the plaintiff, Burke, lived with her son, Jay. 677 F.3d at 369. One night, at a neighbor's party, Jay assaulted Burke and others. *Id.* Burke returned home, and Jay followed later. *Id.* Officers were informed of these events, and they unsuccessfully attempted to contact Burke *via* telephone. *Id.* at 370. Two officers approached Burke's back door and yelled to get the attention of anyone inside; there was no response, though a dog was barking from inside the home. *Id.* The officers then entered Burke's home through the back door. *Id.* The officers spoke with Burke and then left, with the entire exchange lasting less than

two minutes. *Id.* The Eighth Circuit found that the emergency aid exception excused the officers' entry into the home because there was no response to the officers' attempts to hail someone inside of the home, and because Burke was alone in the home with a violent suspect. *Id.* at 372. In the present case, however, Chief Webb had no reason to suspect that a victim and a violent suspect were together in the house, nor did he attempt unsuccessfully to hail Sean from outside the house.

This case falls somewhere in the borderland between *Burke* and *Smith*. The precedents establish that the emergency aid exception applies if a victim or potential victim is in need of immediate aid. In the Court's view, based upon the cases discussed above, the focus of the emergency aid exception is upon the presence of a victim who is in need of immediate aid, not the additional presence of a violent suspect who may cause further harm. Upon arrival, a reasonable officer in Chief Webb's shoes would have known that a violent confrontation involving Sean had occurred and that Sean was in his house. The only evidence Chief Webb encountered that nothing was amiss was Mr. Thorpe's statement that "nothing" was going on. It was reasonable to doubt Mr. Thorpe's statement, as the 911 call and chaotic scene would have reinforced a reasonable officer's understanding that a fight had occurred. As in *Burke*, a reasonable officer in Chief Webb's shoes would have believed that the victim of a recent violent confrontation was in the house and in need of immediate aid. This is different than in *Smith*, where there was no evidence that an injured victim or likely victim was within the house.

To the extent Mr. Thorpe argues that he should have been allowed to enter the house to collect Sean, a reasonable officer would not necessarily have allowed him to do so. A reasonable officer in Chief Webb's shoes would have realized that Mr. Thorpe's

statement that "nothing" was going on directly contradicted the 911 calls. Thus, a reasonable officer could have doubted Mr. Thorpe's veracity. Given Mr. Thorpe's incredible statement, the chaotic situation, and the volatile nature of domestic disputes, a reasonable officer may have believed that allowing Mr. Thorpe to enter Sean's house unaccompanied could have increased the risk to Sean. Furthermore, Chief Webb's stated reasons for entering Sean's house are supported by the undisputed record evidence: Chief Webb entered Sean's house, located Sean, and took Sean outside. Chief Webb did not delay while he was in Sean's house, and he did not otherwise search Sean's house.

In sum, viewing these facts in the light most favorable to Mr. Thorpe, the Court concludes that Chief Webb did not violate clearly established law by forcing entry into the house to confirm that Sean was not in danger. Chief Webb's entry into the house was reasonable under the emergency aid exception because there was recent evidence of violence, it was reported that firearms were present, and a known participant in and victim of the recent violence was known to be in the house. It was therefore objectively reasonable to believe that a person within the house was in need of immediate emergency aid. Chief Webb would therefore be entitled to qualified immunity on Mr. Thorpe's illegal entry claim.

### The "Community Caretaking" Exception to the Warrant Requirement

The Court questions whether the community caretaking exception would excuse Chief Webb's warrantless entry into the house. A warrantless entry under the community caretaking exception is allowed "where the officer has a reasonable belief that an emergency exists requiring his or her attention," but this exception is not applicable when

a police officer is "acting to investigate and uncover crime . . . ." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citations omitted). Here, Chief Webb admitted at his deposition that he entered the house because he "was investigating" and because "there were several factors to consider at that point." (Doc. 26-1, p. 3). This admission gives the Court pause in applying the community caretaking exception here, as this exception to the Fourth Amendment's warrant requirement is inapplicable where police officers are engaged in "the detection, investigation, or acquisition of evidence relating to the violation of criminal law." *Quezada*, 448 F.3d at 1007 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Still, it is unclear to the Court if Chief Webb's statement implies that he was investigating whether a crime had occurred, or whether this statement means that he was searching for a victim of a crime. Taking these facts in the light most favorable to Mr. Thorpe, the Court disagrees with Chief Webb's argument and concludes that the community caretaking exception would not excuse his warrantless entry into the house.

### 2. Illegal Arrest

Mr. Thorpe asserts that Chief Webb also violated his constitutional rights by arresting him for obstruction of governmental operations. Specifically, Mr. Thorpe argues that the retaliatory arrest of a person exercising First Amendment rights is illegal. Chief Webb argues that he is entitled to qualified immunity against this claim. For the reasons explained below, the Court finds that Chief Webb is entitled to qualified immunity on Mr. Thorpe's illegal arrest claim.

Officers are entitled to qualified immunity "if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is

objectively reasonable." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). Thus, the Court must determine whether Chief Webb had "'arguable probable cause' to arrest [Mr. Thorpe]." *Baribeau v. City of Minneapolis*, 596 F.3d 465 (8th Cir. 2010); *see Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996) ("[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right."), *cert. denied*, 519 U.S. 1011 (1996).[10] When an officer arrests an individual due to a mistake of fact, the Court must look "at the totality of the circumstances surrounding the arrest to determine its reasonableness." *Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir. 2003). Even if the arrest is intended to punish protected speech, the "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Peterson v. Kopp*, 754 F.3d 594, 599 (8th Cir. 2014) (citation and quotation omitted). "In other words, [Chief Webb's] alleged motive for the arrest cannot vitiate an otherwise lawful arrest." *Id.* (quoting *Whren v. U.S.*, 517 U.S. 806, 813 (1996)) (other citations omitted).

Chief Webb arrested Mr. Thorpe for obstructing governmental operations. In Arkansas, a person commits the crime of obstructing governmental operations if he or she "[k]nowingly obstructs, impairs, or hinders the performance of any governmental function . . . ." Ark. Code Ann. § 5-54-102(a)(1). A "government function" is defined as any activity which a public servant is legally authorized to undertake on behalf of any governmental unit. Ark. Code Ann. § 5-54-101(4). Per Arkansas Rule of Criminal

---

[10]    The Court acknowledges Mr. Thorpe's argument that the doctrine of "arguable probable cause" has not been adopted by the Supreme Court. It has, however, been adopted by the Eighth Circuit, and the Court is bound to follow that precedent.

Procedure 3.1, "a law enforcement officer lawfully present in any place may . . . stop and detain any person who he reasonably suspects . . . has committed . . . (1) a felony . . . or (2) a misdemeanor involving danger of forcible injury . . . for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances." Ark. R. Crim. P. 3.1. Similarly, police officers may stop a witness of a crime for up to fifteen minutes. Ark. R. Crim. P. 3.5. In an unpublished opinion, the Arkansas Court of Appeals has held that the "disruption of [witness] interviews three times in a matter of moments provided probable cause for" arrest on the charge of obstructing governmental operations. *Nelson v. State*, 2013 Ark. App. 421 (2013) (holding that appellant interfered with governmental operations when he interrupted police officers by saying, "F**k this, I'm going to sleep," and leaving the scene of the crime). The Arkansas Court of Appeals has also held—again, in an unpublished opinion—that a juvenile obstructed governmental operations when he failed to follow a command given by a governmental officer and therefore prevented that officer from securing a juvenile facility. *RB v. State*, 2013 Ark. App. 377 (2013).

The Eighth Circuit dealt with a similar case in *Ehlers v. City of Rapid City*, 846 F.3d 1002 (2017). In that case, plaintiff Randall Ehlers was arrested for obstructing a police officer in violation of South Dakota law. The events at issue occurred at a hockey game: Mr. Ehlers's wife and children were asked to leave the game, and one of Mr. Ehlers's children was subsequently arrested outside of the game. *Id.* at 1007. Mr. Ehlers was advised of the situation and approached the police officer who was conducting the arrest. *Id.* The police officer told him "to step back to the curb . . . , but Ehlers stepped closer to [the police officer] and asked more questions about his son." *Id.* The police officer again

told Mr. Ehlers to step back and warned him that Mr. Ehlers would need to move "before he counted to three . . . ." *Id.* The police officer then told his partner, "Take this guy, he's not listening." *Id.*

The Eighth Circuit concluded that the police officer had arguable probable cause to arrest Mr. Ehlers for obstructing a police officer. *Id.* at 1009–10. It was undisputed that Mr. Ehlers's interference with the police officer's duties only lasted twenty seconds, but the Eighth Circuit noted that South Dakota's obstruction statute does not have a duration requirement. *Id.* at 1009. The Eighth Circuit also noted that a reasonable officer would have considered the possibility that Mr. Ehlers might produce a weapon, especially since he had disobeyed orders and was in close proximity to the police officer. *Id.* The Eighth Circuit concluded that "Ehlers's physical presence, close proximity, and refusal to comply" gave the officer arguable probable cause to believe that Mr. Ehlers's behavior constituted obstruction under South Dakota law. *Id.*

Viewing the facts in the light most favorable to Mr. Thorpe, the Court concludes that Chief Webb had arguable probable cause to arrest Mr. Thorpe for obstruction of governmental operations. Mr. Thorpe's actions were repetitious and cumulative in nature despite repeated commands to stop interfering. First, Mr. Thorpe physically obstructed and attempted to prevent Chief Webb from entering the house. Next, he physically attempted to prevent the Gentry police officers from entering the property. The dashcam video confirms that arriving patrol cars were abruptly stopped as they were entering the driveway, and Mr. Thorpe frankly admits this. Additionally, Mr. Thorpe does not deny that he verbally interrupted Chief Webb's (and the Gentry Officer's) questioning on multiple occasions. Mr. Thorpe also does not deny that he continued to challenge the

officers even after Chief Webb warned him that he would be arrested if he continued to interject himself into the officers' investigation of an assault on the property and the questioning of his son as a participant, witness, or victim. The dashcam video confirms that Mr. Thorpe repeatedly interrupted officers as they attempted to pat down Sean. The same video includes audio of Sean saying that his father had been warned "a hundred times" and "wouldn't shut up." Even viewing this record evidence in the light most favorable to Mr. Thorpe, a reasonable officer could have believed Mr. Thorpe's behavior was interfering with their investigation—particularly the questioning of Sean, a witness of a crime and a potential suspect or victim. Consequently, Chief Webb had arguable probable cause to believe that Mr. Thorpe's actions constituted the crime of obstruction of governmental operations, and Chief Webb is therefore entitled to qualified immunity on the illegal arrest claim.

## C. Claims Against Chief Webb In His Official Capacity

Mr. Thorpe has also sued Chief Webb in his official capacity for the same alleged constitutional violations. These claims must be construed as claims against Chief Webb's employer, the City of Highfill. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (holding that a suit against a public official in his official capacity is a suit against the entity that employs the official). Section 1983 authorizes suits for damages against municipalities for deprivations of federal constitutional rights, but only when such deprivations are inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 & nn.54–55, 694 (1978). "Section 1983 liability for a constitutional violation may attach to a municipality if the

violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). In some instances, an unconstitutional governmental policy may be inferred "from a single decision taken by the highest officials responsible for setting policy" for a municipality, and the question of whether an official has such final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 113 (1998). The Court looks to state and local law to determine whether a municipal official serves as the final policymaker. *Thompson v. Shock*, 852 F.3d 786, 793 (8th Cir. 2017).

Mr. Thorpe presents no evidence of an official policy of the City of Highfill that led to the alleged illegal entry and arrest. He also fails to present any evidence that the violations of his rights were caused by a failure to train or supervise Chief Webb. Mr. Thorpe's only colorable allegation in support of his *Monell* claim is that Chief Webb is the "chief policy maker for law enforcement operations" for the City of Highfill. (Doc. 1, p. 1). As Chief Webb points out, however, Arkansas law provides that city councils—not police chiefs—are the final policymakers for municipal police departments. *See* Ark. Code Ann. § 14-52-101 ("The city council shall have the power to establish a city police department . . . and to prescribe its duties and define its powers . . . ."); *see also Brinkley v. City of Helena-West Helena, Ark.*, 2014 WL 4164614, at *3 (E.D. Ark. Aug. 21, 2014) ("[T]he city council prescribes the police department's duties and defines its powers, *i.e.*, makes the police department's policy."); *Greer v. City of Warren*, 2012 WL 1014658, at *13 (W.D. Ark. Mar. 23, 2012) (same). Chief Webb has presented an organizational chart for the City of Highfill that indicates that Chief Webb is subordinate to the mayor. Viewing all of

the record evidence in the light most favorable to Mr. Thorpe, the Court concludes that no reasonable jury could find the City of Highfill liable under *Monell*, and the City of Highfill is entitled to summary judgment on Mr. Thorpe's official capacity claims.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Chief Webb's Motion for Summary Judgment (Doc. 21) is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**. Judgment will be filed contemporaneously with this Order.

**IT IS SO ORDERED** on this 31st day of March, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE